IN THE SUPREME COURT OF THE STATE OF MONTANA

------------

No. 12764

------------

IN THE MATTER OF
JOHN L. McKEON

------------

OPINION AND ORDER

------------

The matter of the petition of John L. McKeon for reinstatement to the bar of the State of Montana comes before this Court under Rule X, of the Commission on Practice of the Supreme Court of the State of Montana (Order in cause no. 10910, establishing the Commission on Practice, January 1, 1965, effective April 1, 1965).

John L. McKeon was disbarred by this Court on May 13, 1974. In the Matter of John L. McKeon (1974), 164 Mont. 328, 521 P.2d 1307. His disbarment followed his conviction for crimes through a plea bargaining process in which petitioner pleaded guilty to four separate felonies, which included (1) offering false evidence, (2) obtaining money by false pretense, (3) grand larceny by bailee, and (4) forgery. Petitioner was sentenced to five years imprisonment on each count with the last three years of each sentence suspended, the sentences to run concurrently. As a condition of sentence and parole, petitioner agreed to make restitution of funds to individual clients and to the Workers' Compensation Division of the Department of Labor and Industry of the State of Montana. The petitioner has fully served his prison time and has returned to reside in Anaconda, Montana. The findings of the Commission reflect that he has made restitution payments on schedule and that there still remains a balance to be repaid to discharge his restitution obligations in full.

-1-

Notice of the hearing of the application by the petitioner for the reinstatement was sent to the Attorney General of the State of Montana, the United States Attorney, the County Attorney of Deer Lodge County, the president of the Montana Bar Association, and all members of the Third Judicial District of the Montana Bar Association. The notice provided that any and all persons desiring to appear and to be heard in support of or in opposition to the petition should attend and participate in the proceedings. The Commission found that the secretary of the Commission had received over 20 letters in support of petitioner's application and had received none in opposition thereto. No person had requested an opportunity to appear at the hearing in opposition to the application. Supporting petitions were signed by 48 lawyers as were petitions containing approximately 500 signatures of residents of the city of Anaconda. Following the hearing before the Commission on the petition for reinstatement, the secretary of the Commission received an additional 18 letters in support of the application and one in opposition thereto. The opposing letter stated the opinion that anyone convicted of felony should be denied reinstatement.

Prior to the hearing, the Commission on Practice had hired special counsel to investigate on behalf of the Commission, and to determine if there was any evidence that would indicate that the application should be denied. The only adverse reaction reported by the special counsel was from a lumber yard owner in Anaconda who was a former county commissioner. He opposed the application for reinstatement on the grounds that the crimes for which petitioner was convicted were so severe that he should never be allowed to practice. His opposition was not based on any facts occurring subsequent to the time of the disbarment.

The Commission found a uniform consistency among the affidavits, letters and sworn testimony that petitioner sincerely regrets his transgressions, that he did not turn to the use of alcohol or drugs following his conviction, that he did not indulge in self pity, but devoted the last 8 years of his life to assisting the young and the aged. The Commission found him to be a compassionate friend and neighbor. The Commission also found that the petitioner himself was a convincing witness on his own behalf, acknowledging his crime, stating that he was ashamed of it, that he held no resentment for the fact that he was prosecuted and required to go to prison, that he knew he had done wrong, and that he carried no hostility arising out of his convictions and subsequent disbarment. The Commission further found:

> "Accordingly, from the evidence presented at the hearing and otherwise made known to the Commission, the applicant does appear to have rehabilitated himself and since his release from prison led a contrite and productive life. Notwithstanding this proof, the Commission has serious reservations whether the format prescribed for reinstatement which is a curious mixture of public and confidential proceedings will ever bring forth any substantial opposition evidence if it exists. Further, it occurs to us that there is no adequate way for the Commission or the court truly determining the applicant's present ethics and morality. Proof in the form of testimony of friends and supporters of the applicant is not altogether objective evidence. The Commission believes that the best indicator of the applicant's moral propensities lies in the nature and circumstances of the deeds which brought about his disbarment. . .

> "Mr. McKeon's admitted crimes were a series of separate calculated felonies, committed over a long period of time, the victims of which were persons or agencies with whom he developed a trust. There is no indication of alcoholism, family need, or other ameliorating circumstance which claimed Mr. McKeon's criminal acts . . .

> "In view of the gravity of the admitted crimes and accumulative moral turpitude of McKeon's crimes, the Commission determines that there is insufficient proof that the applicant now possesses a high degree of moral and ethical standards which are necessary to practice law in Montana."

Seven members of the Commission signed the majority report denying petitioner's application recommending that the application

-3-

for reinstatement be denied. These included the three lay members who represent the public on the Commission. Three lawyer members of the Commission on Practice filed a minority report in favor of petitioner's reinstatement.

Other arguments against reinstatement raised by the majority report include the effect upon the public, the majority being of the opinion that because of the notoriety and gravity of McKeon's felony convictions and imprisonment, reinstatement would not be in the best interests of the law profession in the state; that if he were applying for the first time as a layman for admission at the University of Montana Law School, he would undoubtedly be denied; and that section 37-61-309, MCA, requires mandatorily that a lawyer convicted of a felony be stricken from the roll of attorneys; that there is an implication from the statute that the conviction of a crime involving moral turpitude mandates permanent deprivation of the right to practice.

Members of the Commission signing the minority report contend that the adoption of a rule that persons convicted of felonies must never again be admitted to practice is harsh and unnecessary; that there has been no public outcry raised against his reinstatement in the area where petitioner is known and resides; and that since his conviction and imprisonment, he has shown himself not to be a repeat offender. The minority concludes that based on the record before the Commission, the evidence of petitioner's rehabilitation is so commanding that his reinstatement is required.

We hold that on the record in this case before the Commission, petitioner McKeon should be granted reinstatement to the Bar of the State of Montana. In so holding we run contra to the opinion of seven members of the ten member

-4-

Commission on Practice. Out of deference to all of the members of the Commission who hold their positions either by appointment by this Court, or by election by their lawyer-peers, we will attempt to explain our reasons for so holding.

The first issue that we examine is the tenet that an attorney, once convicted of a felony, must thereafter be permanently disbarred from practicing in the courts of this State. The Commission majority, though noting that this tenet was not essential to their conclusion, nonetheless found a strong implication in the provisions of section 37-61-309, MCA, upon which to found the tenet. That section provides that upon conviction of a felony the judgment of the Supreme Court must be that the name of the party be stricken from the roll of attorneys, whereas in conviction for cases less than a felony, or for misdemeanor not involving moral turpitude, the judgment of the court may be, according to the gravity offense, or charge, deprivation of the right to practice "permanently or for a limited period."

First, the making of rules governing the conduct of the members of the Bar is particularly within the province of the Supreme Court. Art. VII, § 2, 1972 Mont. Const. The power of the courts generally to control the admission and readmission of lawyers to practice is recognized in section 6.2 of the American Bar Association Standards for Lawyer Disciplinary and Disability Proceedings:

> "6.2 Disbarment. Readmission. The court has exclusive power to readmit a disbarred lawyer.
>
> "The lawyer should not be able to apply for readmission until at least 5 years after the effective date of disbarment and should not be readmitted unless he can show by clear convincing evidence: rehabilitation, fitness to practice, competence, and compliance with all applicable discipline or disability orders and rules."

-5-

Second, the legislature has not shown permanent punishment as its _desideratum_ in its general statutes respecting convictions for crimes:

> "46-18-801. _Effect_ of _conviction_ -- _civil disabilities_. (1) Conviction of any offense shall not deprive the offender of any civil or constitutional rights except as they shall be specifically enumerated by the sentencing judge as necessary conditions of the sentence directed toward the objectives of rehabilitation and the protection of society.
>
> "(2) No person shall suffer any civil or constitutional disability not specifically included by the sentencing judge in his order of sentence.
>
> "(3) When a person has been deprived of any of his civil or constitutional rights by reason of conviction for an offense and his sentence has expired or he has been pardoned, he shall be restored to all civil rights and full citizenship, the same as if such conviction had not occurred."

Third, we have in the past restored to practice attorneys who had been disbarred for conviction of felony, or under circumstances amounting to the commission of a felony. We omit citations to these instances out of respect for the individuals involved.

Fourth, we decline in principle to adopt a position that permanent disbarment is just retribution for a felony conviction. In the deepest well-springs of our beings, expressed in nearly every religious persuasion, is the precept that man, though weak in nature, can nonetheless reform. To deny that humans, even lawyers, are capable of reform is to scant the qualities of memory, understanding and will which distinguish us from other vertebrates.

The second issue to be examined is whether it does irreparable damage to the Bar from the viewpoint of public acceptance, to readmit a person convicted of felony to practice law. It must be admitted that here the majority members of the Commission may have a point, though we doubt

-6-

that the damage is irreparable. Undoubtedly there is a good
deal of skepticism in the public at large when we do readmit
a lawyer who has been convicted of a felony.  Offsetting
that is the relatively good experience we have had in those
cases where  readmission has been granted.

Having determined that conviction of the felony should
not ipso facto make disbarment permanent, and that we have
been willing to risk public skepticism in earlier cases, we
move now to the third issue, whether on the record, petitioner
McKeon has shown by clear and convincing evidence that he is
rehabilitated, and that this Court should risk, and cause
his future clients to risk, the quality of his reform.  The
majority members of the Commission agree that petitioner
"does appear to have rehabilitated himself and since his
release from prison led a contrite and productive life."
The majority members, however, backed away from the conclusion
that he is rehabilitated because of the cumulative nature of
his earlier crimes, which they feel indicate moral propensities,
the cure of which no proof is possible.

This Court agrees that the petitioner does appear to
have been rehabilitated, and from the record can deduce no
risk that petitioner has deluded us about his reform.  If
the evidence here does not support rehabilitation, there
will be little chance for any future disbarred attorney to
establish reform.  It is difficult also for us to close our
eyes to the other facets of petitioner's career and demonstrations
of his ability which have resulted in immense service to the
public.  He is an honorably discharged veteran who served in
the Armed Forces in World War II, having voluntarily enlisted
in those forces at age 17 after graduating from high school.
He was disabled in the war, and attended the University of

-7-

Montana, by virtue of the provisions of the Disabled Veterans Act. Throughout his career he was active in veterans affairs, has held offices in veterans organizations, and even since his disbarment, has actively counseled veterans of all wars including the Vietnam conflict, on their rights as veterans, and he has lent assistance in many problems they have had in connection with their veterans rights, all without charge for his services. While he was a lawyer, he held numerous public positions, including stints as an assistant attorney general for the State of Montana, as Deer Lodge County Attorney, as a member of the school board of trustees, and as state Senator for 14 years, where he represented at various times the Counties of Deer Lodge, Powell, Granite and portions of the County of Missoula.

Since his disbarment he has lived in the community of Anaconda. He chose to return after his conviction to his home among the people he had known, and despite the shame of his criminal convictions. He has had difficulty providing for himself and his family since his disbarment and has survived by using his assets for living expenses in addition to making substantial payments on the obligations he assumed for restitution. He testified at the hearing that he has continued the study of law by reading the decisions of this Court and the Session Laws of the State of Montana and has read extensively in legal periodicals, law reviews, and issues of legal texts as new volumes were published. He has assisted the youth and elderly in his community; he has volunteered his time to the recreation department of Anaconda-Deer Lodge County, and has coached basketball teams composed of eighth grade students, for all of which he has received no compensation. He has particularly interested himself in

-8-

the problems of aged, has been active in the Montana Legacy Legislature, and has helped senior citizens in lobbying efforts. He has busied himself in other public interest pursuits.

In deciding to restore him to the practice of law, we are placing upon him a burden common to all restored lawyers, but particularly emphasized in his case. He must now demonstrate to the public, to the members of the Practice Commission, and particularly to this Court that his reform is genuine, and that our trust is not misplaced.

We are placing no conditions upon his readmission. He is subject to the requirements of continuing legal education that now apply to all lawyers practicing in this state. His duty of restitution is contractual, and is a matter between him and the other parties to the contract. We repeat the language of the California court in Resner v. State Bar of California (1967), 433 P.2d 748, wherein that Court said:

> "There can, of course, be no absolute guarantee that the petitioner will never engage in misconduct again. But if such a guarantee were required for reinstatement none could qualify. All that we can require is a showing of rehabilitation and of present moral fitness. A reading of the entire record indicates that Resner has convincingly established his rehabilitation and moral fitness by his own statements and those of many attorneys on his behalf. Rehabilitation is, of course, a 'state of mind.' The law looks with favor upon the regeneration of erring attorneys and should not place unnecessary burdens upon them. (Citing cases.) Tested by these standards petitioner has met the burden placed upon him. He should be reinstated." 433 P.2d at 755, 756.

WHEREFORE, IT IS ORDERED:

That the petitioner John L. McKeon at a suitable time be and appear before the clerk of this Court, then and there to take and file the oath required of attorneys for admission to the Bar, and that thereupon the clerk of this Court add the name of John L. McKeon to the list of attorneys authorized

to practice law in the courts of this State; and that those courts which have been notified by the clerk of this Court of his disbarment be then notified of his readmission to practice.

DATED this _21_ day of December, 1982.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

-10-

Mr. Chief Justice Frank I. Haswell, concurring and dissenting:

I would reinstate petitioner for the reasons stated by the majority, but I would impose conditions for the protection of the public.

First, I would require petitioner to pass a bar examination. Petitioner has not practiced law for more than eight years. Section 6.2 of the American Bar Association Standards for Lawyer Disciplinary and Disability Proceedings provides in pertinent part:

> "The lawyer . . . should not be readmitted unless he can show by clear convincing evidence: rehabilitation, fitness to practice, competence, and compliance with all applicable discipline or disability orders and rules." (Emphasis mine.)

What better way exists to prove present competence to practice law by clear and convincing evidence than to successfully pass a bar examination?

The fact that petitioner was presumptively competent to practice law at the time of his disbarment in 1974 does not constitute clear and convincing evidence that he is still competent after an eight-year layoff in my view. Nor are the requirements of continuing legal education which are imposed upon all attorneys designed to provide a substitute for a comprehensive bar examination.

Petitioner testified at the hearing on his petition for reinstatement that he has continued the study of law by reading the decisions of this Court, the Session Laws of the Montana Legislature, and has read extensively in legal periodicals, law reviews and issues of legal texts as they were published. What better way exists to evaluate the effectiveness of petitioner's self-study program than for him to

take a bar examination?

Secondly, I would require petitioner to successfully pass the Montana Professional Responsibility Examination. This examination tests the examinee's knowledge of ethical standards demanded of attorneys, their obligations and responsibilities. Petitioner has never taken this test as it has only recently been instituted. As the causes of petitioner's disbarment directly relate to his breach of these standards, obligations and responsibilities, petitioner should be required to successfully pass this examination.

Finally, I would require that petitioner's reinstatement be made expressly conditional on the continued performance of his contract obligation to make restitution to various clients of his and to the Workmen's Compensation Division as requested by the Attorney General. This written restitution agreement dated September 30, 1974, between petitioner and the Workmen's Compensation Division was approved by the then Attorney General, Robert L. Woodahl, and District Judge Peter G. Meloy. As of January 6, 1982, a balance of $26,015.62 remained owing by petitioner. Payment in full plus accrued interest is due by September 10, 1984.

I am not comfortable with readmitting petitioner to the practice of law free of these conditions. Surely, we owe the public in whose midst petitioner will practice these minimum safeguards.

_____
Chief Justice

-12-